### In re FINANCIAL NEWS NETWORK INC., Debtor.

### Bankruptcy No. 91 B 10891 (FGC).

United States Bankruptcy Court, S.D. New York.

Aug. 24, 1991.

K.H. Eckstein, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for the Official Committee of Unsecured Creditors of Financial News Network, Inc. (Committee).

M.A. Rosenthal, R. Orr, Gibson, Dunn & Crutcher, New York City, for Financial News Network Inc. (FNN).

### MEMORANDUM DECISION DENYING PAYMENT OF PREPETITION COUNSEL FEES [1]

FRANCIS G. CONRAD, Bankruptcy Judge, sitting by special designation.

Gibson, Dunn & Crutcher ("Gibson, Dunn"), counsel to the debtor, and Kramer,

---

1. We have jurisdiction to determine this matter under 28 U.S.C. § 1334(b), and under the gener-

al reference to this court dated July 10, 1984 (Ward, C.J.). Modification of automatic stay is

Levin, Nessen, Kamin & Frankel ("Kramer, Levin"), counsel to the Committee, seek payment of fees in the amount of $2,047,-525.38 and $81,948.61 (plus disbursements of $37,595.64), respectively, for services rendered prior to the commencement of this chapter 11 case.

On March 1, 1991, Financial News Network ("FNN") filed for relief under chapter 11 of title 11 of the Bankruptcy Code. Until the recent sale of FNN's core media assets ("Media Assets") to Consumer News and Business Channel Partnership ("CNBC"), FNN was a full-time, national cable television network providing news and informational services to more than 35 million customers.

During the months leading up to the filing, FNN embarked on an intense marketing effort to obtain a purchaser for FNN's Media Assets. After negotiating with a number of interested parties, FNN filed for relief under title 11 and immediately scheduled a hearing for the approval of the sale of its Media Assets, subject to higher and better offer.[2]

Gibson, Dunn was hired pre-petition to assist FNN. Due to FNN's inability to pay Gibson, Dunn's prepetition fees on a current basis, the parties entered into an employment and compensation agreement under which Gibson, Dunn agreed to represent FNN in connection with the sale of the Media Assets and defer payment pending approval of the sale. In return, FNN agreed to compensate Gibson, Dunn for its services at the rate of 125% of the firm's normal billing rates (the "FNN Media Agreement"). Meanwhile, in the Fall of 1990 an unofficial committee of equipment lessors was formed to negotiate an out-of-court restructuring of FNN's business operations. The committee retained Kramer,

Levin as its counsel. A letter agreement was executed by FNN in which it agreed to pay for the services of the committee's counsel. Shortly before the bankruptcy FNN experienced a severe cash drain and was unable to pay Kramer, Levin's fees on a timely basis.

On March 22, 1991, FNN filed a motion to assume the FNN Media Agreement. A sole, limited objection was interposed by the Committee which had no opposition to the payment of Gibson, Dunn's prepetition fees but took exception to the award of a premium. On April 23, 1991, the court heard oral argument on the assumption motion and took the matter under advisement.

On July 3, 1991, Gibson, Dunn was awarded a first interim allowance of $2,473,578.88. Although no award was made as to its prepetition claim, we authorized an allowance for postpetition services rendered in connection with the Media Assets sale at the rate of 125% of the firm's normal billing rates. Similarly, Kramer, Levin requested payment of its prepetition claim while acting as counsel to the equipment lessors committee. At the fee hearing the court awarded Kramer, Levin an interim allowance of $682,751.42 limited to the services rendered postpetition to the Committee. We also reserved decision on its request for payment of its prepetition claim.

Section 365(a) provides, in pertinent part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (West Supp. 1990). Section 1107 provides that in a chapter 11 case a debtor-in-possession shall have all the powers and duties of a trustee. 11 U.S.C. § 1107; *United States v. Whit-*

---

a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (G) and (O). This Memorandum of Decision constitutes conclusions of law under F.R.Civ.P. Rule 52 as made applicable by the Rules of Practice and Procedure in Bankruptcy.

**2.** The auction was like few this court has seen. The hearings to approve the sale to CNBC were highlighted by antitrust challenges raised by the United States Federal Trade Commission and by

the attorneys general of three states. Three emergency appeals were taken, one of which went up to the Second Circuit. The details of the auction and sale of the Media Assets to CNBC are set forth at length in this court's Memorandum of Decision dated May 10, 1991, *In re Financial News Network Inc.,* 91 B 10891 (FGC), 1991 WL 127524, in various district court opinions and one court of appeals opinion.

*ing Pools, Inc.,* 462 U.S. 198, 200, 103 S.Ct. 2309, 2311, 76 L.Ed.2d 515 (1983). As of the petition date Gibson, Dunn was obligated under the FNN Media Agreement to provide legal services to FNN in connection with the sale of the Media Assets; FNN was required, in turn, to pay for the services rendered. The FNN Media Agreement was an executory contract within the meaning of § 365 of the Code, because substantial performance remained on both sides of the agreement. *See In re Select–A–Seat,* 625 F.2d 290 (9th Cir.1980); *In re Gamma Fishing Co. Inc.,* 70 B.R. 949 (Bankr. S.D.Cal.1987); *Schondorf v. Calin,* 58 B.R. 1014 (D.N.J.1986) (employment contract held to be executory).

■ Nevertheless, we conclude that the payment of professional persons is governed by § 327 and its related compensation provisions, and not by § 365. The Bankruptcy Code contains numerous and detailed provisions concerning the employment of professional persons, their compensation and payment. *See* §§ 327, 328, 329, 330 and 503(b)(2). Section 327(a) provides, in pertinent part, as follows:

> [T]he trustee, with the court's approval, may employ one or more attorneys, ... or other professional persons, that do not hold or represent an interest adverse to the estate, and that are *disinterested persons,* to represent or assist the trust-

ee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a) (emphasis added). The "disinterestedness" standard set forth in § 101(13) provides in pertinent part, as follows:

> "disinterested person" means person that—
>
> (A) is not a *creditor,* an equity security holder, or an insider;

11 U.S.C. § 101(13) (emphasis added). Sections 328 and 329 give the court broad discretion in regulating the terms, conditions and payment of professional persons.[3]

Clearly, the Code's drafters intended that payment of the debtor's professionals would be governed solely by § 327 and its related compensation provisions. *Cf. In re First Federal Corp.,* 43 B.R. 388 (Bankr. W.D.Va.1984) "The enactment of 11 U.S.C. § 327 by the Congress intended to place the responsibility for payment of professionals directly under the jurisdiction of the court and its orders...." 43 Bankr. at 389. Gibson, Dunn seeks to side step these provisions (and their requirements) through the assumption of the FNN Media Agreement. Read literally, § 327 and § 101(13) would appear to render any attorney holding a claim against the estate ineligible to serve as counsel to the debtor. In *In re Gire,* 107 B.R. 739, 748 (Bankr.E.D.Cal. 1989), the bankruptcy court observed that counsel's status as a prepetition creditor

---

**3.** Section 328 provides, in pertinent part, as follows:

11 U.S.C. § 328 Limitation on compensation of professional persons

(a) The trustee ..., with the court's approval, may employ or authorize the employment of a professional person under section 327 ... of this title, as the case may be, on any reasonable terms and conditions of employment, including a retainer, on an hourly basis, or on a contingent fee basis. *Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.*

11 U.S.C. § 328. (emphasis added).

Section 329 provides as follows:

11 U.S.C. § 329. Debtor's transactions with attorneys

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) *If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—*

 (1) the estate, if the property transferred—

 (A) would have been property of the estate; or

 (B) was to be paid by or on behalf of the debtor under a plan under chapter 11 ... of this title; or

 (2) the entity that made such payment.

11 U.S.C. § 329. (emphasis added).

rendered questionable his eligibility for employment in the bankruptcy case because, by definition, a creditor is not a disinterested person. *But see In re Jaimalito's Cantina Assoc. Limited Partnership*, 114 B.R. 1 (Bankr.D.C.1990) (application for employment denied where proposed bankruptcy counsel had a prepetition claim of an unspecified amount). In cases where retention of a professional person holding a claim is approved, courts have consistently declined to authorize payment of prepetition claims.[4] Given the express language of the Code and the case law, Congress could have not intended for retained professionals to look to § 365 as a vehicle for payment of prepetition fees.

 Moreover, allowance of attorneys fees through assumption of an employment agreement rather than through the procedures adopted by the Code places unnecessary constraints on the court's ability to evaluate the reasonableness of the fee request. Section 328 gives the court broad discretion to allow or disallow counsel fees notwithstanding the terms and conditions of the employment agreement. In fact, a bankruptcy court may totally disregard an employment agreement where necessary and award compensation more appropriate under the individual circumstances of the case. *In re Port Royal Land & Timber Co.*, 105 B.R. 72 (Bankr.S.D.Ala.1989) Generally, the court does not have the same latitude in the context of an assumption motion. To leave a court solely with the decision to approve or disapprove the assumption of the employment agreement is wholly at odds with the court's duty to evaluate the reasonableness of every fee request. *Cf. In re Chas. A. Stevens & Co.*, 109 B.R. 853, 854 (Bankr.N.D.Ill.1990); *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D.La.1986) (even if no objections are raised the court has a duty to independently examine the reasonableness of the fees).

Our concerns have been shared by at least one court. In *In re Marlin Oil Co.*, 83 B.R. 50, 51 (Bankr.D.Colo.1988), the court stated, albeit in dicta, that "it [was not] contemplated that professionals such as attorneys, could enter into executory contracts pre-petition and have the debtor assume such a contract and thus avoid the scrutiny of the court and the other creditor of the Code provisions...."

This court is fully aware of the results achieved to date in this case, and of the able manner in which Gibson, Dunn has discharged its duties. To allow FNN to assume the agreement, however, is dangerous precedent. An attorney advising a party contemplating bankruptcy possesses special information not generally available to its creditors at large. We believe this special relationship would be compromised were this court to condone a practice that allows this unique position to be used to further counsel's parochial interest in ensuring payment of its fees on the eve of bankruptcy.

 Finally, Gibson, Dunn argues that the court should allow the payment under the "doctrine of necessity." The doctrine's origins may be found in the railway cases, *see e.g. In re Boston and Maine Corp.*, 634 F.2d 1359 (1st Cir.1980), *cert. denied sub nom. Meserve v. Chesapeake & O.R. Co.*, 450 U.S. 982, 101 S.Ct. 1518, 67 L.Ed.2d 817 (1981); *In re Lehigh & New England Railway Co.*, 657 F.2d 570 (3d Cir.1981); *In re Penn Central Transportation Co.*, 467 F.2d 100 (3d Cir.1972), however, its principles have been applied, in limited cases, in the chapter 11 context as well. *Dudley v. Mealey*, 147 F.2d 268 (2d Cir.), *cert. denied*, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr.S.D.N.Y.1989).[5] The "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan

---

4. There is a narrow exception for limited, prepetition services specifically rendered in contemplation of bankruptcy. *In re Gire*, 107 B.R. 739.

5. The extension of the doctrine to the chapter 11 context has not been without its critics. *B & W Enterprises, Inc. v. Goodman Oil Co. (In re B &*

*W Enterprises, Inc.)*, 713 F.2d 534 (9th Cir.1983) (circuit court declined to extend the doctrine of necessity beyond the railroad cases); *In re FCX, Inc.*, 60 B.R. 405 (E.D.N.C.1986); C. Tabb, *Emergency Preferential Orders In Bankruptcy Reorganization*, Bankruptcy Update 1990 at 9–5, 9–13– 9–18 (1990).

payments of prepetition obligations where such payments are critical to the debtor's reorganization.

One recent application of the doctrine in the chapter 11 context is *Ionosphere.* There, the bankruptcy court denied the union's motion to direct the debtor to pay certain prepetition wage claims of its non-active striking airline workers. The union argued that since the debtor had earlier sought and obtained authority to pay its active employees, it should not be allowed to discriminate against its similarly situated non-active striking members. The court, however, found no demonstrable benefit to the estate by authorizing payment to the non-active employees other than the windfall to the affected employees. It concluded that the debtor had sustained its burden that payment of the prepetition claims of its active work force was critical "to preserve and protect its business and ultimately maintain positive employee morale." 98 B.R. at 175. The court stated that "the paramount policy and goal of chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor." *Id* at 176–77, *citing NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

Gibson, Dunn's reliance on the doctrine of necessity is clearly misplaced. To invoke the doctrine and allow the payment would be to read the doctrine as one of convenience rather than necessity. The facts here are in stark contrast to those before the court in *Ionosphere.* There, at the time the court authorized the payment to its active employees the bankruptcy court determined the payment was necessary to keep the airline operational and its reorganization effort alive. Here, the payment sought by Gibson, Dunn is unrelated to FNN's reorganization. Even if we were willing to place ourselves in the camp of those who would extend the "doctrine of necessity" beyond the railroad cases, application of the doctrine is unwarranted under the facts presented here. Accordingly, FNN's motion to assume the FNN Media Agreement is denied.

Kramer, Levin also seeks payment for services rendered to the prepetition equip-ment lessors committee. Kramer, Levin submits that Section 503(b) empowers a court to approve requests for prepetition compensation. Section 503(b) provides, in pertinent part, as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses . . .

including—

\* \* \* \* \* \*

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

\* \* \* \* \* \*

(D) a creditor, an indenture trustee, an equity security holder, or committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

\* \* \* \* \* \*

(4) reasonable compensation for services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection . . .

To establish entitlement to an award under § 503(b), the applicant must show more than just a passing benefit to the estate but must substantially contribute to the case. *In re Richton International Corp.,* 15 B.R. 854 (Bankr. S.D.N.Y.1981). The services need not necessarily lead to a confirmed plan. Kramer, Levin relies on *In re Med General, Inc.,* 17 B.R. 13 (Bankr.D.Minn.1981) in support of its prepetition fees request. There, the bankruptcy court approved a request for prepetition fees by counsel to an informal prepetition committee of general unsecured creditors. The court found "no distinguishable reason on the facts known to the court between the beneficial results of the prepetition activity as opposed to the postpetition activity of the Committee which is admittedly compensable." *Id.* at 14.

Kramer, Levin submits that the services rendered during the period preceding the filing helped foster a cooperative spirit among a group of disparate equipment les-

sors and the Debtor which, in turn, facilitated the sale of the Media Assets. The actual services rendered included review and comment on several draft plans of reorganization, specifically, an analysis of the tax consequences of the sale and treatment of lease claim upon in the plan. No plan, however, was ever finalized. Kramer, Levin also claims to have participated in discussions with potential purchasers, drafted confidentiality agreements and communicated with investment advisors.

We need not reach the issue of whether these services conferred a "substantial contribution" to the case. This court believes that determination would be premature at this junction. The appropriate time for consideration of such an application is at the conclusion of the case. Accordingly, Kramer, Levin's motion is denied, without prejudice.

Submit order in accordance with this opinion.[6]

---

**6.** Under the circumstances of this case, the court's decision is likely to have little effect on the parties pocketbooks. Given the results in the case, unsecured creditors may well be paid in full. Accordingly, our decision today may affect only the timing of payment, not the ultimate recovery.