In re JUST FOR FEET, INC., Sneaker Stadium, Inc., SNKR Holding Corp., Athletic Attic Marketing, Inc., Just for Feet of Texas, Inc., Just for Feet of Nevada, Inc., Just for Feet Speciality Stores, Inc. and Just for Feet of Puerto Rico, Inc., Debtors.

No. 99–4110–RRM to 99–4117–RRM.

United States District Court,
D. Delaware.

Nov. 17, 1999.

Thomas L. Ambro, Mark D. Collins, John H. Knight, Paul N. Heath, and Daniel J. Defranceschi, Richards, Layton & Finger, P.A., Wilmington, Delaware, Alan B. Miller, Harvey R. Miller, Jacqueline Marcus, and Adam Rogoff, Weil, Gotshal & Manges LLP, New York City, for debtors.

Francis A. Monaco, Jr., Walsh, Monzack & Monaco, P.A., Wilmington, Delaware, Mary Grace Diehl, Troutman Sanders, Atlanta, Georgia, for Bank of America, N.A., as DIP Lender.

Norman L. Pernick, Saul, Ewing, Remick & Saul, Wilmington, Delaware, Paul N. Silverstein, and Peter Goodman, Andrews & Kurth LLP, New York City, for Cypress Management, Goldman Sachs & Co., Bennett Management, Trendex Capital Management, Oppenheimer & Co., Citadel Management, et al.

Luc A. Despins, and Craig Druehl, Milbank, Tweed, Hadley & McCloy LLP, New York City, for Ad Hoc Noteholders Committee.

Adam G. Landis, Duane Morris & Heckscher LLP, Wilmington, Delaware, David L. Eades, and Alan W. Pope, Moore & VanAllen PLLC, Charlotte, North Carolina, for Bank of America, N.A., as Agent.

Edward B. Rosenthal, Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, Gilbert Backenroth, Hahn & Hessen, New York City, for Bank of America, N.A., as Indenture Trustee.

Stephen W. Spence, and Kathleen P. Makowski, Phillips, Goldman & Spence, P.A., Wilmington, Delaware, David Neier, and John B. Grant, Camhy, Karlinsky & Stein LLP, New York City, for Saatchi & Saatchi Business Communications, Inc.

John D. McLaughlin, and Maria D. Giannirakis, Daniel K. Astin, Mary Frances Durham, Office of the United States Trustee, Philadelphia, Pennsylvania.

## OPINION

McKELVIE, District Judge.

This is a bankruptcy case. On November 4, 1999, Just For Feet, Inc. and its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States District Court for the District of Delaware. The Debtors operate retail stores that specialize in brandname athletic footwear and related apparel. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Code.

On November 8, 1999, the Debtors filed a motion for authorization to pay the pre-petition claims of trade vendors. On November 10, 1999, five parties, Bank of America, N.A., as administrative agent under the credit agreement of December 10, 1998 ("BofA"), Bank of New York, as indenture trustee of certain subordinated notes ("BONY"), Saatchi & Saatchi Business Communications, Inc. ("Saatchi"), the holders of certain subordinated notes (the "Noteholders") and the United States Trustee objected to the Debtors' motion to pay these pre-petition claims. This is the court's decision on the motion.

### I. FACTS AND PROCEDURAL BACKGROUND

The court draws the following facts from the record of the proceedings in this matter and from the testimony offered into evidence at the November 10, 1999 hearing on the Debtors' motion.

### A. The Origin of Just For Feet

Just For Feet started in 1973 as a chain of superstores specializing in name brand athletic footwear and related apparel. The Just For Feet superstores range in size

from 15,000 to 20,000 square feet and carry approximately 2,500 to 4,500 styles of footwear and related apparel. In comparison, the conventional mall-based sneaker retailers typically carry 200 to 700 styles. Currently there are 151 Just For Feet superstores in 26 states and in Puerto Rico.

In 1997, the Debtors began operating smaller retail specialty stores in addition to the athletic superstores. The specialty stores operate under the names Imperial Sports, Athletic Attic and Athletic Lady and range in size from 4,000 to 6,000 square feet. These smaller stores carry a full complement of footwear and related apparel. Currently, there are 175 specialty stores in 23 states and in Puerto Rico.

Helen Rockey, the president and chief executive office of Just For Feet testified that while there are many athletic footwear retailers that compete in the mall-based locations, Just For Feet dominates the athletic superstore market. She testified that size, selection, advertising and in-store entertainment, including basketball courts and other "things for people to do while wearing sneakers" are important ingredients in the athletic superstore business.

In the 1998 fiscal year, the Debtors reported net sales of approximately $775 million. Prior to July 31, 1999, Rockey testified that Just For Feet reported 20 consecutive profitable quarters since going public. As of October 2, 1999, the Debtors had $764 million in assets and $507 million in liabilities.

In May 1999, the Debtors encountered liquidity difficulties, in part because they mistakenly purchased $50 million of excess inventory. In an effort to address increasing liquidity problems, Rockey testified that Just For Feet is re-focusing on the superstore concept. The Debtors have announced the closure of 85 of the smaller specialty stores.

B. *The Trade Vendors*

The remaining specialty stores and the 151 superstores require a continuous flow of athletic footwear and apparel from Just For Feet's foreign and domestic trade vendors. "We are in the fashion business," Rockey testified. "Don't let anyone fool you that this is a performance industry. We need new styles, new colors, hot products on the floor to get the customer in the door." The largest trade vendors that sell athletic footwear to the Debtors include Nike, New Balance, Fila, Reebok, Adidas, Asics, K–Swiss and Converse.

Rockey testified that Just For Feet orders the majority of its merchandise four to six months in advance and the company has not yet received the merchandise it ordered for the upcoming holiday season. Typically, trade vendors ship merchandise to retailers on credit. After Just For Feet filed for relief under chapter 11 of the Bankruptcy Code, however, Rockey testified that many of the largest trade vendors demanded cash-in-advance and informed Rockey that they would not ship merchandise until their pre-petition claims were paid.

Just For Feet owes its trade vendors $66 million in pre-petition claims. The top ten trade vendors account for approximately half of this total debt. Rockey testified that maintaining favorable credit terms with the trade vendors is critical to Just For Feet's survival. Even with the $25 million in post-petition financing approved by the court on November 8, 1999, Rockey testified that the company does not have sufficient cash to pay creditors on a cash-in-advance basis for merchandise already ordered. According to Rockey, Just For Feet needs to receive $50 million of new inventory before Thanksgiving in order to have a successful holiday shopping season.

C. *The Debtors' Critical Vendor Program*

In the instant motion, the Debtors propose to pay the pre-petition and post-peti-

tion claims of "critical" trade vendors as they become due, in exchange for the vendors' written agreement to extend credit to Just For Feet on similar or better terms than the company has enjoyed in the past. Even though the Debtors named this proposal the "critical vendor program," Just For Feet will offer the program to all trade vendors, starting with the company's largest vendors. According to Rockey, "offering a full selection of goods across a broad vendor base is a core element of the concept that differentiates the superstores. We need to embrace all of the vendors."

Without the court's authority to pay the pre-petition claims of the trade vendors, the Debtors argue that many vendors will refuse to provide necessary goods and services to the Debtors on favorable credit terms. Rockey testified that the inability to acquire sufficient quantities of merchandise before Thanksgiving may doom the reorganization of Just For Feet.

### D. Objections to the Critical Vendor Program

On November 10, 1999, five parties, BofA, BONY, Saatchi, the Noteholders and the United States Trustee, objected to the Debtors' critical vendor program. Three of the parties, BONY, the Noteholders and the United States Trustee, argue that, as a matter of law, the court cannot authorize payment of pre-petition claims of critical vendors because section 105(a) of the Bankruptcy Code does not permit the court to adjust the statutory priorities established by the Code. Further, all five parties argue that even if the court has the power to authorize payment of pre-petition claims pursuant to section 105(a), the Debtors have not described their proposal in sufficient detail to determine if payment of the pre-petition vendor claims is necessary.

## II. DISCUSSION

Generally, the filing of a petition for reorganization under chapter 11 of the Bankruptcy Code stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6) (1999). Certain pre-petition claims by employees and trade creditors, however, may need to be paid to facilitate a successful reorganization. Section 105(a) of the Code provides a statutory basis for the payment of pre-petition claims.

§ 105. Power of court

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent abuse of process.

11 U.S.C. § 105(a) (1999).

█ The United States Supreme Court first articulated the "necessity of payment doctrine" over a century ago in a railroad bankruptcy when it stated that "[m]any circumstances may exist which may make it necessary and indispensable to the business of the road and the preservation of the property, for the receiver to pay pre-existing debts...." *Miltenberger v. Logansport*, 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882). While this doctrine was not codified in the Bankruptcy Code, courts have used their equitable power under section 105(a) of the Code to authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization.

The United States Court of Appeals for the Third Circuit reiterated the necessity of payment doctrine in *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir.1981). The Third Circuit held that a court could authorize the payment

of pre-petition claims if such payment was essential to the continued operation of the debtor. *Id.* (stating that court may authorize payment of pre-petition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Central Transp. Co.,* 467 F.2d 100, 102 n. 1 (3d Cir.1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *In re Columbia Gas Sys., Inc.,* 171 B.R. 189, 191–92 (Bankr.D.Del.1994) (noting that in the Third Circuit, debtors may pay pre-petition claims that are essential to continued operation of business).

More recently, counsel for the Debtors report that this court and the bankruptcy court for the District of Delaware have authorized the payment of pre-petition claims to vital suppliers and trade vendors. *See, e.g., In re Gross Graphic Sys., Inc.,* Case No. 99–2756(PJW) (Bankr.D.Del. July 30, 1999); *In re Discovery Zone, Inc.,* Case No. 99–941(JJF) (D.Del. April 21, 1999); *In re Acme Steel Co.,* Case No. 98–2179(MFW) (Bankr.D.Del. Sept. 29, 1998); *In re WSR Corp.,* Case No. 92–1241(MFW) (Bankr.D.Del. June 10, 1998); *In re FF Holdings Corp. and Farm Fresh, Inc.,* Case Nos. 98–37, 98–38(JJF) (D.Del. Jan. 7, 1998).

In this case, five parties have objected to the Debtors' proposal to pay pre-petition claims of trade vendors in exchange for customary credit terms. Three of those parties, BONY, the Noteholders and the United States Trustee, contend that the court cannot authorize payment of pre-petition claims because doing so would reorder the statutory priorities established by the Bankruptcy Code. The objectors rely on two 1996 Supreme Court decisions holding that a bankruptcy court cannot equitably subordinate IRS tax claims under section 510(c) in derogation of the statutory priorities set forth in the Code. *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996); *United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996).

The objectors also cite several cases where courts have declined to pay pre-petition claims under section 105(a) on the ground that such payments would upset the priority scheme contemplated by the Code. *See, e.g., In re Oxford Management, Inc.,* 4 F.3d 1329, 1333–34 (5th Cir.1993) (holding that district court improperly used its equity powers to authorize payment of commissions by the debtor to associate brokers); *In re FCX, Inc.,* 60 B.R. 405, 410 (E.D.N.C.1986) (holding that by authorizing payment of pre-petition claims arising from payroll expenses, payroll taxes and purchases of grain, bankruptcy court improperly subordinated claims of remaining creditors).

Essentially, BONY, the Noteholders and the United States Trustee argue that this court does not have the authority under section 105(a) of the Bankruptcy Code to authorize payment of the pre-petition claims of trade vendors. The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11.

■ The Supreme Court cases cited by the parties do not hold that a bankruptcy court may never use its equitable powers to authorize payment to vendors when such payment is critical to the reorganization. Rather, *Noland* and *Reorganized CF & I* prohibit a court from subordinating tax claims under section 510(c) without sufficient justification for reordering the statutory priorities established by the Code. The necessity of payment doctrine recognizes that paying certain pre-petition claims may be necessary to realize the goal

of chapter 11—a successful reorganization. *In re Lehigh & New England Ry. Co.*, 657 F.2d at 581.

██ Further, all five parties objecting to the Debtors' motion argue that even if the court has the power to authorize payment of pre-petition claims pursuant to section 105(a) of the Code, the Debtors have not described their proposal in sufficient detail to determine if payment of the pre-petition vendor claims is necessary. To invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is "critical to the debtor's reorganization." *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr.S.D.N.Y.1991); *see also In re NVR L.P.*, 147 B.R. 126, 128 (Bankr.E.D.Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr.S.D.Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process"). Thus, the court must determine whether the payment of pre-petition claims of trade vendors in this case is critical to the Debtors' reorganization.

██ Clearly, Just For Feet cannot survive unless it has name brand sneakers and athletic apparel to sell in its stores. The Debtors need a continuous supply of inventory from athletic footwear and apparel vendors such as Nike, New Balance, Fila, Reebok, Adidas, Asics, K–Swiss and Converse. Rockey testified that without new merchandise from these vendors, Just For Feet will not survive. Therefore, the court finds that payment of the pre-petition claims of certain trade vendors—the athletic footwear and apparel vendors—is essential to the survival of the debtor during the chapter 11 reorganization.

With regard to other trade vendors that the motion may contemplate paying, the Debtors have not shown that payment of the pre-petition claims of other vendors is critical to Just For Feet's survival in reorganization. The court invites the Debtors to renew the motion and present additional evidence with respect to other trade ven-

dors, but absent such a showing, the court will not grant the Debtors' motion with respect to these other vendors.

The court notes that the expedited nature of these proceedings may have limited the evidentiary showing on this motion. With Thanksgiving less than two weeks away, the Debtors need to resolve this issue quickly to replenish the inventory in their stores for the upcoming holiday shopping season. With this context in mind, and in light of the evidence presented, the court grants the Debtors' motion to pay the pre-petition claims of trade vendors only with respect to athletic footwear and apparel vendors. The Debtors are authorized and directed to pay the pre-petition claims of athletic footwear and apparel vendors as they become due, in exchange for the vendors' written agreement to extend credit to the Debtors on similar or better terms than the Debtors have enjoyed in the past. The court retains exclusive jurisdiction over any disputes arising out of these written agreements with athletic footwear and apparel vendors.

The court will enter an order in accordance with this opinion.