## In re PAYLESS CASHWAYS, INC., Debtor.

### No. 01–42643.

United States Bankruptcy Court, W.D. Missouri.

Oct. 18, 2001.

*MEMORANDUM OPINION*

ARTHUR B. FEDERMAN, Chief Judge.

Debtor Payless Cashways, Inc. (Payless) filed a motion asking this Court to grant administrative expense priority to certain critical lumber vendors' pre-petition claims to the extent those same vendors agree to extend post-petition unsecured credit on certain terms to Payless. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## ISSUE

In order to obtain post-petition credit from certain suppliers, a Chapter 11 debtor seeks to pay all or a portion of those suppliers' pre-petition claims, and to grant such suppliers a post-petition administrative expense claim for the new purchases. Does the Bankruptcy Code (the Code) empower the Court to authorize a debtor to pay pre-petition debts prior to confirmation of a Plan of Reorganization and, if so, under what circumstances?

## DECISION

Section 364(b) of the Code empowers the Code to authorize a debtor-in-possession (or a trustee) to obtain unsecured credit out of the ordinary course of business. That section grants the Court broad authority, at the outset of a case, to approve borrowing arrangements that are found to be in the best interests of the debtor, its estate, and its creditors. Since the proposed arrangements are critical to the continued operation of the debtor, they should be approved.

## DISCUSSION

This Chapter 11 case, the second one involving this debtor, was filed on June 4, 2001. On that date, debtor filed this motion to grant administrative expense priority to critical lumber vendors for post-petition credit, and to pay all or a portion of those vendors' pre-petition claims. Debtor operates 117 stores selling building materials to both contractors and individuals. The Court held an emergency hearing on the date the case was filed, at which coun-

sel appeared on behalf of the debtor, two groups of secured creditors, and the United States Trustee, among others. The President and CEO of the debtor, Millard Barron, testified that one of the core services provided by the debtor is the retail supply and sale of lumber and wood products. According to Mr. Barron, if the debtor does not have wood available to supply, its potential customers will go elsewhere to buy not just the wood, but also the nails, paint, tools, and other products needed for their construction job. He further testified that, due to competitive conditions in the lumber industry, the debtor's primary sources of supply would be well able to sell their products elsewhere. Furthermore, he testified that the debtor was in a serious out-of-stock situation, during the industry's peak summer season. Payless, he testified, was losing significant sales because it could not guarantee its customers compliance with their building needs throughout a given project. And, as a result of its previous reorganization, in 1997, Payless has had difficulty establishing credit with certain vendors on standard industry payment terms of 30–60 days. Mr. Barron also testified that debtor did not have post-petition financing in place, but was instead seeking court authority to use cash collateral.

Debtor requested authority to deal with its Critical Lumber Vendors on the following terms:

1. The Critical Lumber Vendors would extend post-petition credit on standard industry terms on an unsecured basis in an amount equal to at least 100% of each such vendor's prepetition claims;

2. Payment will be due 30–60 days following delivery for any post-petition lumber supplies provided by such vendors;

3. Such arrangement would remain open up to one year following confirmation of a Plan of Reorganization in the case; and

4. The total credit to be authorized under the arrangement to all Critical Lumber Vendors would not exceed $10 million.

I treated the motion as a borrowing request under Section 364 of the Code and, as authorized by Bankruptcy Rule 4001(c)(2), held the hearing on emergency notice. There were no objections to either the holding of the emergency hearing, or to the relief requested. At the conclusion of the emergency hearing I ordered that a final hearing be held on at least 15 days notice to all creditors. Pending such final hearing, I authorized debtor to incur up to $8 million in debt, and to pay that amount of pre-petition debt, pursuant to the proposed arrangement, finding that that figure represented the amount necessary to avoid immediate and irreparable harm to the estate pending the final hearing.

The final hearing was held on June 22, 2001. At that hearing, the debtor amended the motion to reduce the total allowed credit from $10 million to $8 million, and to further provide, based on negotiations with Critical Lumber Vendors, that those extending credit on these terms would be given an administrative expense in an amount not to exceed 90% of their prepetition claims. Prior to the final hearing, the United States Trustee filed an objection, arguing that the Bankruptcy Code does not empower the Court to authorize a debtor to pay pre-petition debts prior to confirmation of a Plan, and that in any event debtor has not demonstrated that it could not obtain these supplies elsewhere. In the alternative, the United States Trustee asked the Court to modify the prior order to provide that in the event of a later conversion to Chapter 7, a trustee

would be free to recover as preferential transfers the monies paid to Critical Lumber Vendors pursuant to such order. There were no other objections, and the Committee of Unsecured Creditors, which was appointed subsequent to the emergency hearing, agreed to the proposal as modified. Mr. Ed Zimmerlin, the debtor's Senior Vice President of Merchandising and Marketing, testified that even with this proposal in place, two lumber suppliers had refused to do business with Payless since this bankruptcy filing. He further testified that debtor desperately needs the product which is the subject of this motion, and that the terms offered are essential to the timely acquisition of that product.

■ As the United States Trustee points out, the Code establishes the priority in which claims are to be paid, either pursuant to a Chapter 11 Plan, or in the liquidation of a Chapter 7 estate.[1] Prior to enactment of the Code, however, courts recognized that in certain circumstances it was in the best interest of all concerned to pay certain pre-petition creditors out of turn, as an inducement to them to continue working for, or doing business with, the debtor.[2] Prior to enactment of the Code, this practice was justified under what was known as the "doctrine of necessity", the idea being that payment of those claims was necessary to keep the debtor in business, and that keeping the debtor in business, and its employees at wage-paying jobs, was in the best interest of all concerned. Since enactment of the Code, various courts have permitted debtors-in-possession to pay pre-petition debts on the grounds that payment of such claims was necessary to effectuate a successful reorganization, or at least to give the debtor the opportunity to propose any type of plan at all.[3]

■ The United States Trustee argues that nothing in the Code authorizes, or even contemplates, the payment of pre-petition debts prior to confirmation of a Plan of Reorganization. Certainly courts are obligated to strictly adhere to the priorities established by the Code in approving a Chapter 7 distribution.[4] And, a Court is prohibited from confirming a Chapter 11 Plan if such Plan is found to "discriminate unfairly" with respect to a dissenting class of claims.[5] But the Code does not absolutely prohibit payment of pre-petition claims prior to confirmation. Indeed, section 549 authorizes a Chapter 7 trustee to set aside only those post-petition payments of pre-petition obligations that are "not authorized under this title or by the court."[6] Thus, the Code recognizes that the court has some limited power to authorize preferential treatment to certain creditors. The question is when it is appropriate to exercise that power.

■ Section 364(b) gives the court broad authority to allow a debtor to obtain credit, out of the ordinary course of business, and allowable as an administrative

1. 11 U.S.C. §§ 507 and 726.

2. *Miltenberger v. Logansport,* 106 U.S. 286, 314, 1 S.Ct. 140, 165, 27 L.Ed. 117 (1882).

3. *In re Just for Feet,* 242 B.R. 821(D.Del.1999); *In re Equalnet Communications Corp.,* 258 B.R. 368 (Bankr.S.D.Tex. 2000); *In re Gulf Air, Inc.,* 112 B.R. 152 (Bankr.W.D.La.1989); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174 (Bankr.S.D.N.Y.1989).

4. 11 U.S.C. § 726; *United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996).

5. 11 U.S.C. 1129(b)(1); *United States v. Reorganized CF & I Fabricators of Utah, Inc.,* 518 U.S. 213, 229, 116 S.Ct. 2106, 2115, 135 L.Ed.2d 506 (1996).

6. 11 U.S.C. § 549(a)(2).

expense.[7] In a case such as this one, where the debtor does not have post-petition financing in place, the bare promise of a priority administrative expense claim, subject to the senior claims of lienholders, cannot be expected to induce suppliers to extend credit to a debtor. Therefore, if the debtor is to obtain credit, it may well need to offer something else to its suppliers. In approving the granting of preferential treatment to suppliers, in exchange for the granting of credit out of the ordinary course, a court should consider the following factors, among others:

1. Whether the procedural requirements of Bankruptcy Rule 4001 have been complied with;

2. Whether the transaction is an arms-length transaction;

3. Whether approval of the borrowing is critical to the future of the business, given the condition of the business at the time the motion is heard, and given the status of its post-petition financing;

4. Whether the transaction confers a benefit on the estate and its creditors, not just the payees;

5. Whether interested parties are represented and, if not, the level of sophistication of unrepresented parties;

6. The extent to which there is unanimous support or strong disagreement from the creditor body.[8]

In applying these principles to a request to prefer certain creditors as part of a borrowing agreement, the Court must be guided by practicality and common sense. If the court is satisfied that the debtor will not be able to obtain inventory or labor of the same quality on a timely basis, and that that is critical to survival of the business, the Court must decide whether the granting of preferential treatment to some creditors is a better result than closing the business, or allowing it to die slowly for lack of necessary supplies. In making that determination, as stated, the views of the creditor body are critical. Here, the views of the unsecured creditors are most relevant, because they are the ones most directly affected. Those unsecured creditors are represented by a committee, which approved the arrangement.[9] Based on testimony offered at both hearings, I am satisfied that payment of the pre-petition obligations was necessary to obtain post-petition credit from the Critical Lumber Vendors, on standard industry terms, and that the delivery of wood products from those vendors is indeed critical to the survival of the debtor. Furthermore, the amount to be paid represents less than 2% of the debtor's pre-petition debt. In return for paying that debt, the debtor is being given the opportunity to restock its stores and to sell not only the inventory purchased, but also the other inventory and tools required by its customers in their remodeling jobs. I further find that the proposal represents arms-length transactions with suppliers who are not obligated to supply the debtor and, given industry conditions, would not supply debtor in the quantities, and on as timely a basis, as they would with this proposal in place. Accordingly, the motion of debtor, as modified, will be sustained, as follows:

1. The Critical Lumber Vendors identified by debtor may extend post-petition

---

7. 11 U.S.C. § 364(b).

8. *In re Just for Feet,* 242 B.R. at 825–826; *In re Equalnet Communications Corp.,* 258 B.R. at 369–70.

9. I note that Georgia–Pacific, one of the critical vendors, represented at the hearing that it did not participate in deliberations of the Committee regarding this matter.

credit on standard industry terms to debtor on an unsecured basis in an amount which is at least equal to 100% of such vendors' pre-petition claims; and

2. Payment will be due for product supplied by such Critical Lumber Vendors 30–60 days following delivery; and

3. Debtor is authorized to pay pre-petition claims of the Critical Lumber Vendors, up to the amount of credit extended post-petition, but in no event more than $8 million; and

4. The Critical Lumber Vendors are granted administrative expense claims in the amount of 90% of the credit extended by each such vendor pursuant to the terms of this Order.

Finally, I also reject the United States Trustee's alternative argument, that those vendors which are paid on pre-petition debts pursuant to this proposal should be liable for those payments as preferential transfers in the event the case later converts to Chapter 7. As shown, Section 549 exempts payments of pre-petition obligations which are authorized by court order. In so doing, the statute insures that those doing business with a Chapter 11 debtor are entitled to rely on orders issued by the court supervising that debtor. Since the payments made to these vendors pursuant to the June 4, 2001 order, as well as the order accompanying this opinion, have been authorized by this court, there is no basis for a Chapter 7 trustee to later recover those payments.

An order in accordance with this Memorandum Opinion will be entered this date.